## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ERIKA VILLAR, individually and as
personal representative of the Estate
of Jean-Pierre Villar, deceased,

     Plaintiff,

v.                                 CASE NO: 8:05-cv-673-T-26TGW

CHARLES WELLS, in his official capacity
as Sheriff of Manatee County, Florida;
ROBERT AUBUCHON; EDWIN GEORGIE; and
HOLLI BODNER,

     Defendants.

_____/

## O R D E R

Before the Court are Defendants Robert Aubuchon and Edwin Georgie's Motion

for Summary Judgment (Dkt. 41), Defendant Charles Wells' Motion for Summary

Judgment (Dkt. 42), the Statement of Undisputed Facts submitted by all Defendants with

attachments (Dkts. 44, 46-89), Plaintiff's Response to Aubuchon and Georgie's Motion

(Dkt. 92), Plaintiff's Response to Wells' Motion (Dkt. 91), and Plaintiff's Statement of

Disputed Facts with attachments.[1]  (Dkt. 93).  After careful consideration of the

---

[1]  Defendant Holli Bodner settled with Plaintiff, was dropped as a Defendant from this lawsuit and dismissed as a party with prejudice before summary judgment motions were filed.  (Dkts. 39 & 40).  Plaintiff sued Holli Bodner in this action for malicious prosecution, false imprisonment and negligence.  (Dkt. 1 at Counts Six through Eight).

submissions of the parties and the entire file, the Court concludes that summary judgment should be granted on the federal claims.

## Background

This action stems from the alleged unlawfulness of the taking into custody of and transportation of Jean-Pierre Villar, Plaintiff's deceased husband, by two deputies of the Sheriff's Office of Manatee County, Florida, pursuant to a "Baker Act" order.[2] Defendants Robert Aubuchon and Edwin Georgie, deputies with the Manatee County's Sheriff's Office, arrived at Mr. Villar's residence on April 9, 2003, with an order signed by a Florida state court judge for the involuntary commitment of Mr. Villar.  Mr. Villar had undergone reconstructive back surgery involving the surgical attachment of two metal rods to his spine on March 7, 2003.  He was at his home convalescing and wearing a full torso back brace when Deputies Georgie and Aubuchon arrived to execute service of the order.

Plaintiff claims Mr. Villar was subjected to excessive force and was not reasonably accommodated in the transport to the facility for evaluation.  When the deputies attempted to convince Mr. Villar to ride with them to Manatee Glens Hospital, he did not want to go.  The deputies, according to Mr. Villar, grabbed, squeezed and twisted his arms and bent him forward in an attempt to cuff his hands behind his back.  When the

---

[2] Florida's Baker Act, found at sections 394.451 et seq. of the Florida Statutes, provides for the involuntary commitment of an individual to a facility for mental health evaluation.

pain shot through his tender back down his leg, he began to cry and scream for the police. The deputies called the police, and two officers came.  The police did not see the deputies apply any force other than holding Mr. Villar's arms.  Mr. Villar was visibly upset, however, when the police arrived.

After the police convinced him to ride to Manatee Glens with Deputy Georgie in his patrol car, Mr. Villar entered the patrol car by squatting and sliding.  He laid on his back for the ride.  During the ride he was in pain.  Plaintiff contends Mr. Villar should have been transported by ambulance.

### Claims for Relief

Plaintiff admits that for the purpose of the claims brought in this lawsuit, the Baker Act order was valid, despite the fact that Dr. Holli Bodner, a licensed psychologist and neighbor of Mr. Villar's, committed perjury in the procurement of the order.[3]  The claims in this action include three counts against Deputies Aubuchon and Georgie in their individual capacities, and four counts against Sheriff Wells in his official capacity.  The three counts against Deputies Aubuchon and Georgie include: (1) violations of section 1983 of the Civil Rights Act caused by the improper method of taking Mr. Villar into their custody and transporting him to a medical facility, thereby resulting in bodily injury, pain and suffering, mental anguish, loss of the capacity to enjoy life and the loss of

---

[3]  Dr. Bodner pleaded no contest to the misdemeanor charge of perjury, and was adjudicated guilty and convicted.  She received six months' probation, fines, court costs, and weekends in jail for ten consecutive weeks.

worker's compensation benefits (Count Four); (2) assault and battery (Count Five); and

(3) the loss of consortium from April 9, 2003, until Mr. Villar's death (Count Nine).  The

four counts against Sheriff Wells include: (1) violations of the Americans with

Disabilities Act (ADA) and section 504 of the Rehabilitation Act of 1973, by excluding

Mr. Villar from services, programs, or activities provided by the Sheriff's office and

failing to reasonably accommodate Mr. Villar by transporting him to the approved facility

by ambulance and without the attempted use of handcuffs (Counts One and Two); (2)

violations of section 1983 by failing to properly train deputies in the area of taking

medically fragile persons into custody relating to the use of handcuffs and securing an

ambulance for transport, and for failing to discipline for violations of police standards

(Count Three); and (3) the loss of consortium (Count Nine).

### Mr. Villar's Complaint

Because Mr. Villar is now deceased, although the cause of his death was unrelated

to the events that occurred in April 2003, his written Complaint to the Manatee County

Sheriff's Office made on April 16, 2003, is set forth in its entirety as follows:[4]

> On Wednesday April 9, 2003 at approximately 1:15 p.m. I
> was assaulted by Manatee Sheriff Deputy Georgie on my
> front step while being served a Baker Act order.  This is the
> account of what took place on the afternoon of April 9, 2003.
> I was called to my front door by a knock.  I came to front door
> and saw what appeared to be two policemen, so I opened the

---

[4]  Mr. Villar's death poses a problem with respect to what statements may be used
as evidence in this case, because of the lost opportunity for cross-examination of Mr.
Villar.

door slightly and said "Can I help you."  The officer/sheriff Georgie said, "Manatee Sheriff Department would you mind stepping outside for a minute."  I then said sure and stepped out onto my stoop in front of my door.  I was then spoken to by Deputy Georgie and told "Mr. Villar?," and I said, "Yes, that's me."  He then identified themselves as the Manatee Sheriff's Department and that they are here to take me to the Manatee Glens Hospital.  At that point the Deputy to my left, which was Deputy Georgie, put his left hand on my left shoulder and his right hand against the door.

At that point Deputy Georgie informed me that I was not under arrest, however I needed to come with them to the Manatee Glens Hospital for an evaluation.  I then said to Deputy Georgie I don't know of any evaluation I'm supposed to have and was this asked for by my surgeon Dr. Glasser.  He said, "No, this was ordered by Judge (not sure what name he has)" and I responded I don't know who that is and what you're talking about, I just had major reconstructive back surgery a few weeks ago and pointed to my back brace that I was wearing with my right hand, and I'm in no condition to go anywhere I'm supposed to be laying down.  At this point Deputy Georgie squeezed my left arm a little harder and said "I don't give a God Damn Shit what you're supposed to do, you're coming with us!  At this point I became very afraid of what was happening and said to Deputy Georgie, "Please let go of my arm you're hurting me!"  Deputy Georgie then replied, "Shut the fuck up and get in the car!"  I then said I don't know what's going on here, but I'm not going any where with you until you get the Longboat Key Police here.

Deputy Georgie then said, "We don't need any God Damn Longboat Key Police here to get permission, I'm the Sheriff and this is ordered by the Judge and this is my jurisdiction. At this point I even became more frightened because he wouldn't get the police on the scene.  So I felt myself getting upset, and my back started to hurt and I begged him Please, you're hurting me just let me get the Longboat Key Police on the phone.  Deputy Georgie then said, "Shut the fuck up and get in the car!"  I again said I'm not going any where without the Longboat Key Police here.

At that point the sheriff on my right started to get closer to me (I don't know his name) and I became even more afraid and my back started to hurt even more.  I then said can't I even at least wait for my wife to get home?  Deputy Georgie then said, "No you can't."  Then the next thing that happened was I saw Deputy Georgie nod his head, and the next thing that happened was Deputy Georgie grabbed my left arm to twist it and with his right hand grabbed my shirt just above my back brace and started to force me forward while the other Deputy was twisting my right arm behind my back.  As they both started forcing me to bend forward and take me down this horrific pain! shot through my back and down my legs!  My first thought was to fall on my face and then instinctively I tried to stand up and started screaming for Help!! Help!!  I then yelled for my neighbor LEE, LEE and then I started to crying as the pain intensified.

At that point they both started to let up on me and as I continue to cry Deputy Georgie then waved his fingers at me in a mocking fashion and in a mocking voice Deputy Georgie said, "Awe Poor Baby did I hurt you!" and I was crying and said Yes, can I please go lay down and was told No.  I then said Please come in my house and call the Longboat Key Police and I can lay down.  Deputy Georgie then said to the other deputy Go ahead and radio Longboat Key Police, and No you cannot go inside so I was forced to stand until the police arrived.

(Dkt. 93, Exh. 2).  Mr. Villar signed the above Complaint with the understanding that "if the investigation proves these allegations to be false, I may be liable to both civil and criminal prosecution.  (Dkt. 93, Exh. 2).[5]

_____

[5]  Mr. Villar also testified at a deposition in the criminal matter against Dr. Holli Bodner on October 26, 2004.  (Dkt. 93, Exh. 11— State of Florida v. Holli Bodner, Case No. 2004-MM-3288, in the County Court of Manatee County, Florida).  At the time of the deposition, the instant action had not been filed yet, and the present Defendants were not represented at the deposition.  In any event, a review of the deposition reveals that Mr. Villar's testimony remained consistent with his Complaint filed with the Sheriff's

In his written summary and conclusion of the investigation conducted at the Sheriff's Professional Standards office, Inspector Sergeant William Vitaioli incorporated verbatim much of Mr. Villar's Complaint.  At no time did anyone from the Sheriff's office take a sworn taped statement or sworn testimony from Mr. Villar.

## Deputy Georgie's Sworn Statements

Deputy Georgie testified at his deposition (Dkts. 58-65) that he saw the full torso back brace when Mr. Villar emerged from the back of the house where he was laying down.  (Dkt. 59 at 27, 48).  After Mr. Villar ambulated to the front door, Deputies Georgie and Aubuchon explained to Mr. Villar that he needed to come with them to Manatee Glens Hospital for an evaluation.  (Dkt. 59 at 32-34).  He took Mr. Villar's left arm and Deputy Aubuchon took Mr. Villar's right arm to see if they could prompt him to walk to one of their patrol cars.  (Dkt. 59 at 35-36).  Mr. Villar stiffened up when they held his arms and screamed for them to call the Longboat Key police.  (Dkt. 59 at 36-38).  Deputy Georgie testified that he did not have his handcuffs out, nor did he or Deputy Aubuchon attempt to handcuff Mr. Villar.  (Dkt. 59 at 36-37).  Deputy Georgie testified that it was standard procedure to cuff anyone any time he put someone in the back seat.  (Dkt. 61 at 64).  He stated that he did not always follow procedure in the case of Baker Act cases, however, because he empathized with those people.  (Dkt. 61 at 64).

---

office.

When Officer Cavanaugh of the Longboat Key police arrived, and later Captain Jensen, Mr. Villar agreed to go with the deputies.  (Dkt. 60 at 40-42).  Deputy Georgie did not remember whether Captain Jensen offered to call an ambulance, and he did not remember whether he offered to call an ambulance before they placed him in the patrol car but he "was certainly well aware of the situation." (Dkt. 60 at 43).  Deputy Georgie is certain that he offered an ambulance after they left the scene and were riding in the patrol car.  (Dkt. 60 at 44 & 46; Dkt. 93, Exhs. 6-7 at pg. 11).  Deputy Georgie stated that Mr. Villar was complaining about the pain in his back while riding in the patrol car, but he stated that Mr. Villar declined the offer to wait for an ambulance to come to complete the trip to Manatee Glens Hospital.  (Dkt. 93, Exhs. 6-7 at pgs. 11-12).

At the time of the service of the Baker Act order on Mr. Villar, Deputy Georgie had worked for the Manatee County Sheriff's Office for over fifteen years.  (Dkt. 58 at 7). He had worked in the civil process section for approximately two to three years before he retired in December 2003.  (Dkt. 58 at 5-6).  He served about fifty Baker Act orders during his tenure with the Manatee County Sheriff's Office.  (Dkt. 58 at 9-10).   Of all the times he served a Baker Act order on someone, he did not recall ever calling for transport other than a patrol car.  (Dkt. 58 at 11).  He confirmed that the Manatee County Sheriff's Office does not instruct deputies on the "shock and awe" procedure, which he used in the execution of the Baker Act order in this case.[6]  (Dkt. 58 at 15: Dkt. 59 at 37-39).  It is not

---

[6]   After an internal investigation of this matter, Deputy Georgie was found to have engaged in conduct unbecoming of a deputy with respect to his "shock and awe" tactics

the policy of the Sheriff's office to notify the local police before serving a Baker Act order.  (Dkt. 58 at 20).

During his deposition Deputy Georgie testified that he did not know before serving the order that Mr. Villar had recently undergone back surgery.  (Dkt. 58 at 23-24).  In his taped sworn interview taken by Sergeant Vitaioli of Professional Standards, however, Deputy Georgie stated that the paperwork he possessed before the execution referred to Mr. Villar's back surgery.  (Dkt. 58 at 24-25; Dkt. 93, Exhs. 6-7 at pg. 9).  He also stated that it was obvious that Mr. Villar was wearing a full back brace when he saw him.  (Dkt. 93, Exhs. 6-7 at pg. 7 & 9).  The internal investigation report states that "[t]he Deputies were aware of Mr. Villar's back surgery as it was written on the Baker Act papers."  (Dkt. 93, Exh. 2).

**Deputy Aubuchon's Sworn Statements**

_____

for "using rude or insulting language offensive to the public while on-duty."  (Dkt. 93, Exh. 2).  The findings of the internal investigation read in pertinent part:

> Deputy Georgie admitted to saying God damn in his shock and awe.  Mr. Villar states that Deputy Georgie used the words "shut the fuck up" several times.  Deputy Aubuchon stated that he does remember Deputy Georgie raising his voice, but does not know what was said.

(Dkt. 93, Exh. 2).

Deputy Aubuchon[7] testified at his deposition that he was unsure of the exact procedure to be used when taking a person into custody pursuant to a Baker Act order. He testified that it was left to the deputies' discretion regarding whether to handcuff the individual. (Dkt. 51 at 13-14).  When Deputy Aubuchon previously worked in transporting prisoners, it was the policy to transport physically disabled persons in the patrol car, as opposed to the paddy wagon, due to safety.  (Dkt. 51 at 7 & 18).  In the twenty-five to thirty Baker Act orders he has served, he has never had the issue of transporting a disabled person arise.  (Dkt. 51 at 20-21).  Deputy Aubuchon made a distinction between placing someone under arrest, at which time the deputies would normally use handcuffs, and serving a Baker Act order, which is civil in nature and at which time the deputies would try not to use handcuffs if at all possible.

With respect to Mr. Villar, Deputy Aubuchon was aware from either the Baker Act papers or from speaking with Deputy Georgie that Mr. Villar had recently had back surgery.  (Dkt. 52 at 35).  Deputy Aubuchon testified that Mr. Villar was laying down on a bed when they knocked on the door. (Dkt. 52 at 47).  It was obvious that he was wearing a back brace.  (Dkt. 52 at 47-48).  Deputy Aubuchon testified that neither he nor Deputy Georgie tried to handcuff Mr. Villar and neither attempted to bend him forward to put his hands behind his back.  (Dkt. 52 at 53).  He testified that when they each held one of his arms, Mr. Villar turned his head and screamed to call the police.  (Dkt. 52 at 54).

---

[7]  Deputy Aubuchon served as a highway patrolman in Mississippi from 1969 through 1992.  (Dkt. 51 at 11).

Deputy Aubuchon could not recall the exact words Deputy Georgie used, but noted that he may have used some vulgar words, particularly when Deputy Georgie attempted to use the shock and awe treatment.  (Dkt. 52 at 59).  He remembered that Mr. Villar began crying at some time before he entered the patrol car.  (Dkt. 53 at 62 & 67).  Mr. Villar eventually voluntarily squatted and maneuvered himself into the backseat of Deputy Georgie's car, laying down on his back.  (Dkt. 53 at 68-69).  He also testified that Deputy Georgie pulled off the road and radioed him because Mr. Villar had been complaining of pain, but Mr. Villar had refused to wait for an ambulance to carry him the rest of the way to Manatee Glens.  (Dkt. 53 at 70).

In his taped sworn statement taken before Professional Standards, Deputy Aubuchon stated that he "knew [Deputy Georgie] was trying to do a little shock and awe to try to get him in that patrol car since we had talked for ten minutes and he hadn't even budged."  (Dkt. 93, Exh. 3 at 6).  He noted that Deputy Georgie was shouting at Mr. Villar, but could not quote exactly what he said.  (Dkt. 93, Exh. 3 at 11).  The back brace was obvious because Mr. Villar was wearing it outside his shirt.  (Dkt. 93, Exh. 3 at 8).  Deputy Aubuchon stated that Mr. Villar told them that he had just undergone back surgery.  (Dkt. 93, Exh. 3 at 8).

**Officer Cavanaugh's Sworn Statements**

At his deposition, Officer Cavanaugh of the Longboat Key Police Department [8] testified that when he arrived at the residence, the deputies "had their handcuffs in their belt, you know, in the belt loops. . . . one of the officers, I'm not sure who it was, had the handcuffs in their hand and the other one had them in his belt."  (Dkt. 48 at pg. 8 & 15). He stated that Mr. Villar told him that the deputies had hurt him and that they had grabbed him and tried to bend him over to handcuff him.  (Dkt. 48 at pgs. 9, 12 & 29). Mr. Villar, however, was not handcuffed when he arrived, and the deputies did not attempt to handcuff Mr. Villar with Officer Cavanaugh present.  (Dkt. 48 at pg. 17).  He did not witness any physical abuse or use of abusive language.  (Dkt. 48 at pgs. 10-11).

During the taped sworn statement taken pursuant to the internal investigation, Officer Cavanaugh stated that he did not observe Mr. Villar either being handcuffed or in handcuffs when he arrived at his residence.  (Dkt. 93, Exh. 3-5 at 6).  He stated that the Sheriff's deputies and he agreed that Mr. Villar would not be handcuffed as long as Mr. Villar complied with their requests.

Officer Cavanaugh stated that Mr. Villar was crying very hard when he arrived at the residence so that it was difficult to understand what he was saying.  (Dkt. 93, Exhs. 3-5 at 4-5).  Mr. Villar told him that the Sheriff's deputies had hurt him.  (Dkt. 93, Exhs. 3-5 at 6-7).  He stated that Mr. Villar got into the patrol car by himself and lay down on his

---

[8]  Mr. Villar wanted the Longboat Key police called because he knew them and they knew him as a result of calls made regarding his ongoing dispute with his neighbor, Dr. Holli Bodner.

back.  (Dkt. 93, Exhs. 3-5 at 8-9).  He stated that Mr. Villar told him that Deputy Georgie had yelled at him and that the deputies had tried to bend him over by twisting his arms to cuff his hands.  (Dkt. 93, Exhs. 3-5 at 6).

### Captain Jensen's Sworn Statements

At his deposition, Captain Jensen testified that he arrived at the residence after Officer Cavanaugh.  (Dkt. 49 at pg. 11).  Mr. Villar told Captain Jensen that the deputies had grabbed him to forcibly take him and that they had hurt him.  (Dkt. 49 at pgs. 15-16; Dkt. 50 at pg. 38).  Captain Jensen did not see any handcuffs out at the time he arrived, nor did he see Mr. Villar handcuffed.  (Dkt. 49 at pgs. 15 & 17).  He testified that Mr. Villar was crying and screaming that the deputies had hurt him.[9]  (Dkt. 49 at pgs. 23 & 25).  Captain Jensen testified that he offered Mr. Villar an ambulance before he slid himself into the back of the patrol car, but Mr. Villar declined, saying that one was not necessary.  (Dkt. 49 at pgs. 16-17 & 25; Dkt. 50 at pg. 36).

### Injuries

Plaintiff directs this Court's attention to Plaintiff's deposition[10] and Mr. Villar's medical records to establish the physical injuries Mr. Villar sustained as a result of the incident with the deputies.  His surgeon, Dr. Glasser, wrote on May 5, 2003, after a two-

---

[9]   In Captain Jensen's taped sworn statement given pursuant to the internal investigation, he gave the same testimony that Mr. Villar was crying and screaming and told him that the deputies had hurt him. (Dkt. 93, Exh. 5 at 3-4).

[10]   Plaintiff testified about Mr. Villar's severe and constant pain and the set back in his recovery resulting from the events of April 9th.  (Dkts. 72-75).

month post-operative examination, that Mr. Villar was "doing very well with improvement of his pain until an injury about a month ago at which time he reinjured his back." Dr. Glasser noted his continued slow recovery from the event as well. He indicated that his wounds were healing well but his activities were still limited. (Dkt. 93, Exhs. 9 & 10).

On July 13, 2003, Mr. Villar was admitted to the hospital for evaluation of back pain and incontinence. (Dkt. 93, Exhs. 9 & 10). Dr. Glasser's partner's report of that date indicates that "after being involved in an altercation in mid-April . . . he had increasing pain in the lumbosacral region with extension in the left buttocks." His report indicates that the Magnetic Resonance Imaging (MRI) showed no evidence of a disk rupture or herniation. He states that Dr. Glasser believed Mr. Villar had a lumbar myofascial strain and had recommended anti-inflammatories, muscle relaxants, and physical therapy.

On August 4, 2003, Dr. Glasser reported that at the five-month examination, Mr. Villar continued to complain of pain in his back with severe pain in his entire right leg, all worsened by activity. He noted that Mr. Villar "initially did well but then was involved in an altercation with marked worsening of his back pain." (Dkt. 93, Exhs. 9-10).

**Defenses**

The deputies seek summary judgment on the ground of qualified immunity.  The
Sheriff seeks summary judgment on the defenses that Mr. Villar was not injured while
being transported and therefore is not liable under either the ADA or Rehabilitation Act,
and that no custom, policy, practice or procedure of the Sheriff's office caused any
constitutional violation.  For reasons which will become evident, the Court will not
address the grounds relating to the state law claims.

### Standard of Review

Summary judgment is proper only when "there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment as a matter of law."
Fed.R.Civ.P. 56©).  The facts must be viewed, and all reasonable inferences drawn, in the
light most favorable to the non-moving party.  See Brosseau v. Haugen, 543 U.S. 194,
195 n. 2, 125 S.Ct. 596, 597 (2004); Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir.
2002).  Although generally inadmissible hearsay "cannot be considered on a motion for
summary judgment," every general rule has its exceptions, permitting the Court to
sometimes consider hearsay at the summary judgment stage.  See Macuba v. Deboer, 193
F.3d 1316, 1323-24 (11th Cir. 1999).

### Objections to Statements of Mr. Villar

In the body of their Motion, the deputies fail to assert that either Mr. Villar's
written Complaint submitted to Professional Standards, his deposition in the criminal case
against Dr. Bodner, or the contents of the medical records, may not be admitted for the
purpose of proving the truth of Plaintiff's case.  Rather, the deputies relegate to a footnote

in their Statement of Undisputed Facts their objection "to any hearsay statements of Mr. Villar which may be offered."  In passing, they emphasize that Mr. Villar was never deposed or subject to cross-examination.

While Mr. Villar was no longer living at the time this action was filed, he was undoubtedly available to give a sworn statement or sworn testimony subject to cross-examination during the course of the Sheriff's internal investigation.  No one took advantage of that opportunity.  Although the deputies did not present an argument in their Motion against considering Mr. Villar's statement, his deposition, or his medical records, this Court, nevertheless, would have to cross that bridge at any future trial of this matter. Having acknowledged this predicament, this Court will consider the submissions in the light most favorable to the non-moving party, Plaintiff, for purposes of resolving this summary judgment proceeding.

**§1983 Claim against Deputies Aubuchon and Georgie in their Individual Capacities**

The deputies, as government officials sued under section 1983, seek summary judgment on the ground that they are entitled to qualified immunity.  First, the deputies must establish that they were performing a "discretionary function" at the time the alleged violation occurred.  See Holloman v. Harland, 370 F.3d 1252, 1263-64 (11th Cir. 2004). After satisfying the "discretionary function" test, the burden shifts to the Plaintiff to demonstrate that the deputies have in fact committed a constitutional violation and that the constitutional right was "clearly established" at the time of the incident.  See Saucier

v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L. Ed. 2d 272 (2001); Holloman, 370 F.3d at 1264.

A discretionary function encompasses acts "of a type that [fall] within the employee's job responsibilities." Holloman, 370 F.3d at 1265. One of the job responsibilities of deputy sheriffs is serving civil process, including the service of valid Baker Act orders. In this case, the Baker Act order was facially valid, and the service of such order constituted a discretionary function of their job.

The constitutional right of Mr. Villar that Plaintiff claims was violated is one arising from the Fourth Amendment— the right to be free from the use of excessive force during an arrest, investigatory stop or other "seizure" of a free citizen. See Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 1867, 104 L. Ed. 2d 443 (1989)). "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger, 381 F.3d at 1248. Plaintiff must establish that the handling of Mr. Villar in the execution of the Baker Act

order[11] was objectively unreasonable based on the perspective of the deputies and officers at the scene.[12]

The force applied by the deputies must be reasonably proportionate to the force exerted by Mr. Villar. Factors to be considered in determining whether the force was objectively reasonable include "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (quoting Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002)).

To determine whether the violation was "clearly established," the Court may look to three methods of notice or warning: (1) "whether the federal statute or constitutional provision is so clear, and the conduct is so bad, that it precludes qualified immunity even in the total absence of case law;" (2) if the conduct is not "bad enough," then whether case law "can be applied broadly to a number of factual situations;" and (3) whether case law containing comparable specific facts is applicable. Kesinger, 381 F.3d at 1250 n. 6 (citing Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002)). The Supreme Court has

---

[11]   It is irrelevant for purposes of this analysis that the order later proved to be the product of perjury.

[12]   It is important to note that Plaintiff could not have maintained "a section 1983 claim based on a violation of Florida's Baker Act, as the Baker Act is not a federal constitution or law of the United States." See Greer v. Hillsborough County Sheriff's Dep't, No. 8:04-cv-2034-T-23-T-MSS, 2005 WL 2416031, at *2 (M.D. Fla. Sept. 30, 2005) (citing Constantino v. Madden, No. 8:02-cv-1527-T-27TGW, 2003 WL 22025477, at *4 (M.D. Fla. Apr. 1, 2003) (citing Knight v. Jacobson, 300 F.3d 1272, 1276 (11th Cir. 2002)).

addressed the first type of warning in <u>Hope v. Pelzer</u>, 536 U.S. 730, 122 S.Ct. 2508, 153

L. Ed. 2d 666 (2002).  In <u>Hope</u>, the Supreme Court held that hitching a prisoner to a post

for exacting gratuitous pain constituted cruel and unusual punishment and precluded a

finding of qualified immunity, relying on notice of "a general constitutional rule already

identified in the decisional law . . . with obvious clarity to the specific conduct in

question, even though 'the very action in question has [not] previously been held

unlawful.'" <u>Hope</u>, 536 U.S. at 741.  The Supreme Court has also distinguished the first

category from the third category of fair warning involving what prior factual scenarios are

necessary to fall within this last category.  <u>See</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 125

S.Ct. 596, ___ L. Ed. 2d ___ (2004).

     In <u>Brosseau</u>, the Court distinguished <u>Hope</u> as presenting an "obvious" case, and

held that in cases of fleeing suspects, however, specific case law must be reviewed to

determine whether a particular officer's actions fall within the "'hazy border between

excessive and acceptable force.'" <u>Brosseau</u>, 543 U.S. at 201, 125 S.Ct. at 600 (citing

<u>Saucier v. Katz</u>, 533 U.S.194, 206, 121 S.Ct. 2151, 2158 (2001)).

     Plaintiff argues that this case is an "obvious" case under the first category with no

need of additional fair warning by case law.  Alternatively, Plaintiff argues that

<u>Rodriguez v. Farrell</u>, 280 F.3d 1341 (11th Cir. 2002), meets the requirement of the third

type of notice.[13]  In <u>Rodriguez</u>, the wrong Mr. Rodriguez was arrested pursuant to a valid

_____

    [13]  Plaintiff also cites <u>Tepper v. Canizaro</u>, No. 6:04-cv-1257-O-31DAB, 2005 WL
2484644 (M.D. Fla. Oct. 7, 2005), which is an unpredential district court case, not one of

-19-

arrest warrant— a case of mistaken identity.  Unbeknownst to the police officers, Mr. Rodriguez had recently undergone shoulder surgery.  In making the arrest, an officer grabbed Mr. Rodriguez's arm, twisted it behind Mr. Rodriguez's back, and forced it up to just below the shoulder blade, causing him to scream out in pain.  The officer completed the cuffing.  Mr. Rodriguez suffered injuries including twenty-five subsequent surgeries and the eventual amputation of his left arm below the elbow.

The Eleventh Circuit granted qualified immunity in <u>Rodriguez</u>, holding that painful handcuffing, without more, does not rise to the level of a constitutional violation of the Fourth Amendment and, alternatively, does not constitute excessive force.  The <u>Rodriguez</u> court elaborated on the fact that it could not be inferred that the officer knew or should have known that Mr. Rodriguez's arm was injured and demanded special care.  Plaintiff argues that <u>Rodriguez</u> would have been decided differently had the officer known of the prior shoulder surgery.  Plaintiff contends that because the deputies knew of Mr. Villar's surgery from the obvious full back brace and from the Baker Act papers, <u>Rodriguez</u> should be considered a clear warning under the third category of fact-specific case law that the deputies' acts were unreasonable.

---

the United States Supreme Court, the Eleventh Circuit or the Florida Supreme Court, <u>see</u> <u>Mercado v. City of Orlando</u>, 407 F.3d 1152, 1159 (11th Cir. 2005), and which was decided after the date of the incident in this case and therefore cannot serve as fair warning.  In any event, <u>Tepper</u> involved a frail, elderly woman who was attending her son's hearing when a deputy sheriff in the courtroom used force in an attempt to get her to leave the courtroom.  The incident was on videotape, and the court found that the deputy was not entitled to qualified immunity on the excessive force claim because the issue of probable cause presented a question of fact for trial.

Based on the facts of this case taken in the light most favorable to Plaintiff, the Court finds that this case does not present the "exceptional case in which a defendant officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable . . . officer that what the defendant officer was doing must be 'unreasonable' within the meaning of the Fourth Amendment." Rodriguez, 280 F.3d at 1350 n.18.  First, this case does not involve a criminal arrest, but the execution of a Baker Act order.  See Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005) (noting that situations not involving a criminal arrest "do not fit neatly within the Graham framework").  Second, assuming the deputies did twist his arm behind his back and bend him forward, they did not actually handcuff him.[14]  Mr. Villar began crying and screaming for the deputies to call the police, which they did.

Plaintiff contends that the twisting and bending amount to a blatant use of excessive force in the service of a Baker Act order given the minimal resistance exerted by Mr. Villar and the obvious fragile medical condition of Mr. Villar.  Plaintiff can point to no case, however, that gives the deputies fair warning that in the execution of a Baker Act order on an individual ambulating with a back brace, they may not attempt to use some physical force to execute the order.  The order requires that the deputies take the individual to a facility for mental evaluation and provides that there is a substantial likelihood that the individual will cause serious bodily harm to himself or another person

---

[14]   Mr. Villar never stated that he was actually handcuffed, only that the deputies attempted to handcuff him.

as evidenced by recent behavior.  Thus, it seems logical that the force applied by the deputies in the face of Mr. Villar refusing to accompany the deputies from his residence,[15] may be considered reasonably proportionate to the need for that force.  While Mr. Villar did not attempt to flee, obviously due to the back brace, he did resist accompanying the deputies to the patrol car so that they could take him to the facility.  Whether Mr. Villar's arms, hanging freely outside the back brace, should not have been grabbed and twisted to attempt handcuffing, would be a factual scenario in need of fair warning through "materially similar" case law predating the incident.

Even assuming the twisting was not proportionate to the need for the force, the Court must look further to the extent of the injuries received by Mr. Villar.  See Draper, 369 F.3d at 1277-78.  Looking at the medical evidence objectively, the MRI shows no herniation or  disk rupture, and the pins were not dislodged or moved.  Mr. Villar's physician diagnosed lumbar myofascial strain, recommending anti-inflammatories, muscle relaxants, and physical therapy.  The injuries Mr. Villar suffered do not begin to reach the extensive injuries suffered by Mr. Rodriguez— the loss of part of his arm. While viewing the deputies' actions through the luxury of hindsight might tend toward reaching a different conclusion, this Court may not rely on hindsight, but must view them from the perspective of a deputy faced with this particular situation in the field.  This Court cannot say that under the circumstances of executing a Baker Act order on an

---

[15]   Mr. Villar never stated that he agreed to go with the deputies until after the police came.

ambulating individual wearing a back brace, the force used by the deputies and resulting

nonpermanent injuries amount to objectively unreasonable acts mandating the loss of

qualified immunity for the deputies.[16]

### ADA and Rehabilitation Act Claims Against Wells in his Official Capacity

Plaintiff argues that Sheriff Wells is vicariously liable for violations of the ADA

and the Rehabilitation Act and is directly liable for failure to train the deputies in the

making of accommodations for persons with disabilities in the course of handling and

transporting those persons to avoid use of excessive force.[17]  The salient facts with respect

to the method of transportation to the facility, viewed in the light most favorable to

Plaintiff, reveal that Captain Jensen of the Longboat Key police offered transportation by

ambulance to Mr. Villar, which Mr. Villar declined.  Deputy Georgie stopped his patrol

car and offered Mr. Villar to wait for an ambulance, however, Mr. Villar believed he

could stand the pain because he was given assurances that the facility was near.  There are

no contentions that any additional injury occurred during the transport.  Mr. Villar

squatted and slid into the back seat of the patrol car without assistance, and therefore no

force, from the deputies or police at the scene.  Neither are there any contentions that Mr.

---

[16]   The fact that this Court has not focused on the language used or the manner of
delivery of such language by Deputy Georgie, should not be read as the condoning of
such treatment; rather, the method by which Deputy Georgie spoke to Mr. Villar did not
constitute physical force causing any injury.

[17]   Plaintiff concedes, however, that the failure to train claim would be futile in
view of the absence of a causal link between the Sheriff's failure to train and the deputies'
failure to accommodate Mr. Villar in his handling and transport to the facility.

Villar was treated any differently from other individuals with back braces or that he was

involuntarily committed because of his disability.

The Rehabilitative Act and the ADA require that a plaintiff be a qualified

individual with a disability.  The Rehabilitation Act then requires that the individual be

denied benefits of a program or activity of a public entity which received federal funds,

and was discriminated against based on the disability.  See 29 U.S.C. § 794(a).  Title II of

the ADA requires as its second and third elements that the individual be "either excluded

from participation in or denied the benefits of a public entity's services, programs, or

activities or was otherwise discriminated against by the public entity," and that such

exclusion, denial of benefits, or discrimination was by reason of his disability.  See Shotz

v. Cates, 256 F.3d 1077, 1080 (11th Cir. 2001); Constantino v. Madden, No. 8:02-cv-

1527-T-27TGW, 2003 WL 22025477 (M.D. Fla. Apr. 1, 2003).  Whether either of these

statutes applies to the execution of a Baker Act order is unclear.[18]

Giving Mr. Villar the benefit of the doubt that he was disabled as that term is

defined in each Act, and further assuming that a cause of action exists for the failure to

reasonably accommodate individuals with disabilities in the handling and transporting of

them following a seizure, see Gorman v. Bartch, 152 F.3d 907, (8th Cir. 1998); Bircoll v.

Miami-Dade County, No. 05-20954-Civ, 2006 WL 164912, at *3 (S.D. Fla. Jan. 18,

---

[18]   The Eleventh Circuit has extended the ADA to claims brought by state prison
inmates for injunctive relief.  See Miller v. King, 384 F.3d 1248 (11th Cir. 2004).

2006), this Court finds that Plaintiff cannot avoid summary judgment.[19]  Here, Plaintiff

claims that the deputies should have transported Mr. Villar to the facility in an

ambulance.  The record is devoid of what Mr. Villar knew about being offered an

ambulance and of any request made by Mr. Villar for an ambulance.  In any event, Mr.

Villar had been transported by his wife in the front seat of their Jeep Cherokee, as the seat

reclined to a comfortable position.  Mr. Villar entered the patrol car on his own without

complaint, and having been offered a change to an ambulance, he declined the offer.  A

review of his written Complaint before Professional Standards makes no mention of being

injured in the transport to the facility.  Throughout the execution of the order, the deputies

were aware of his back brace, and Mr. Villar did not make a complaint about improper

transport.  This case does not involve improper treatment of Mr. Villar because of his

disability.

## Remaining Claims

Because the Court has resolved Plaintiff's federal claims in favor of Defendants,

only Plaintiff's state law claims of assault and battery and loss of consortium remain

pending in this action.  Title 28, section 1367 of the United States Code provides that the

district courts may refrain from exercising supplemental jurisdiction over state claims

where it has dismissed all the underlying federal claims.  See 28 U.S.C. § 1367(c)(3).  In

---

[19]   See also Gohier v. Enright, 186 F.3d 1216, 1220-21 (10th Cir. 1999) (holding
that failing to reasonably accommodate an arrestee's disability in the course of the
investigation or arrest is a viable discrimination claim under the ADA and the
Rehabilitation Act).

making this determination, the Court should consider factors such as "comity, judicial economy, convenience, fairness, and the like." See Crosby v. Paulk, 187 F.3d 1339, 1352 (11th Cir. 1999) (quoting Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 257 (1st Cir. 1996)).  Although this decision is discretionary, see Englehardt v. Paul Revere Life Ins. Co., 139 F.3d 1346, 1350 (11th Cir. 1998), the dismissal of state law claims is strongly encouraged where the federal claims are dismissed prior to trial.  See Baggett v. First Nat'l Bank, 117 F.3d 1342, 1353 (11th Cir. 1997).  Where the Court declines to exercise supplemental jurisdiction over such claims, the claims should be dismissed without prejudice so they can be refiled in the appropriate state court.  See Crosby, 187 F.3d at 1352.  In the interest of judicial economy and convenience, the Court declines to exercise supplemental jurisdiction over the remaining state law claims in this action.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)    Defendants Robert Aubuchon and Edwin Georgie's Motion for Summary Judgment (Dkt. 41) is **GRANTED** on all federal claims found in Count Four.  The Clerk is directed to enter final summary judgment in favor of Defendants Aubuchon and Georgie and against Plaintiff on Count Four.

(2)    Defendant Charles Wells' Motion for Summary Judgment (Dkt. 42) is **GRANTED** on all federal claims found in Counts One, Two and Three. The Clerk is directed to enter final summary judgment in favor of Defendant Wells and against Plaintiff on Counts One, Two and Three.

(2)    Counts Five and Nine are dismissed without prejudice to bringing them in

state court.

(3)    The Clerk is directed to close this file.

**DONE AND ORDERED** at Tampa, Florida, on March 7, 2006.


_____s/_____
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


<u>COPIES FURNISHED TO</u>:
Counsel of Record